UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| iFinex Inc., | ) |
| Applicant, | ) ) ) |
| v. | ) ) Case No.: |
| Enterprise Bank & Trust, | ) ) |
| Respondent. | ) ) |

## DECLARATION OF GIANCARLO DEVASINI IN SUPPORT OF APPLICATION TO CONDUCT DISCOVERY PURSUANT TO 28 U.S.C. § 1782

I, Giancarlo Devasini, declare:

1. I am the Chief Financial Officer for iFinex Inc. ("**iFinex**") and have held that position during all relevant times mentioned in the following declaration. I submit this declaration in support of iFinex's Application to Conduct Discovery Pursuant to 28 U.S.C. § 1782, and based on my personal knowledge; the examination of records and documents contained in the files of iFinex and maintained in the regular course of business; and in certain matters and where so indicated, upon information and belief.

### iFinex's Business

2. iFinex operates a leading global virtual currency platform operating under the brand and trade name of Bitfinex, specifically, on and through www.bitfinex.com. Bitfinex provides a technology platform for customers—both business and individuals—to engage in the trade of digital tokens (e.g., bitcoin and Ethereum) using U.S. dollars, Euros, British pounds, and/or Japanese yen. iFinex is incorporated in the British Virgin Islands.

3. Before using Bitfinex's platform, customers must enter into a contract with Bitfinex agreeing to their terms of service, which are publicly available on the Bitfinex website. Customers wishing to deposit fiat currency—such as U.S. dollars, Euros, British pounds or

Exhibit 1

Japanese yen—on the platform must go through an extensive due diligence process. iFinex also has in place standards to monitor transactions, assess risks, and file Suspicious Activity Reports (commonly referred to as a SAR) and other reports required by applicable law.

4. Customers who want to purchase virtual currency through Bitfinex using fiat currency must first deposit their funds into their Bitfinex account. Once fiat currency is deposited, they may trade those funds for digital tokens with other users. They may then withdraw those digital tokens. They may, alternately, withdraw unused fiat currency from Bitfinex or fiat currency that is the proceeds from future trading.

5. For these platforms to work, customers depend on iFinex's ability to receive and send fiat currency. This concept is similar, but not the same, to a customer of a U.S. financial institution having access to her money from a branch, on demand.

6. Until early 2017, customers who sought to deposit fiat currency into their Bitfinex account could do so by interbank wire transfer, transferring funds from their own bank accounts into certain bank accounts held by iFinex in Taiwan. In early 2017, however, certain U.S. banks successfully pressured iFinex's Taiwanese banks into discontinuing this arrangement.

7. Without a readily available banking solution, iFinex turned to a third-party payment processor doing business as "Crypto Capital."

**iFinex's Agreement with Crypto Capital**

8. Crypto Capital marketed itself as enabling its customers to deposit and withdraw fiat funds instantly to certain virtual currency exchanges including, at the time, Bitfinex. In late 2014, Crypto Capital agreed to act as a payment processor[1] for the Bitfinex exchange, although the large majority of processing activity did not commence until 2017. That is, when Bitfinex customers sought to deposit fiat currency into their Bitfinex accounts, Bitfinex would provide customers with banking details to which the deposits were to be remitted by bank wire, as well as

---

[1] Broadly speaking, a "payment processor" is a third party that facilitates financial transactions between parties.

certain identifiers to include in the wire details. Crypto Capital represented that the accounts receiving customer deposits were owned and operated by Crypto Capital or its related entities.

9. Once Crypto Capital received funds transmitted, it would use the identifier to allocate deposits to a Bitfinex account and communicate receipt of the deposit to Bitfinex. Generally, Bitfinex would log onto the Crypto Capital platform to confirm that the wire was received and approve the deposit receipt. At that point, the funds were made available to the Bitfinex customer on the Bitfinex platform. Pursuant to the parties' agreement, Crypto Capital would hold these funds on behalf of Bitfinex, but would also transfer funds to Bitfinex on demand.

10. Customer withdrawals processed by Crypto Capital were handled similarly. A Bitfinex customer would submit a withdrawal request to Bitfinex. Bitfinex would log onto the Crypto Capital platform and fill in the beneficiary details provided by the customer. Bitfinex would then approve the withdrawal request and Crypto Capital would settle the withdrawal by remitting the funds to the Bitfinex customer from a bank account owned by Crypto Capital.

11. As part of the parties' agreement, besides a nominal fee for each deposit or withdrawal, Crypto Capital charged no fee for these services to iFinex because it was able to earn substantial interest on the funds it held on iFinex's behalf in its accounts. Crypto Capital's agreement to act as a payment processor was made by one of its principals—an individual who identified himself to me as Oz "Joseph." In 2019, I learned that Mr. Joseph's last name was actually "Yosef." Yosef was my primary contact at Crypto Capital, and I had numerous communications with him by phone and text from the 2017 through early 2019.

**iFinex Begins to Discover Crypto Capital's Malfeasance**

12. From early 2017 through late 2018, Bitfinex customers transferred more than $1.5 billion to various bank accounts purportedly held or controlled by Crypto Capital. By July 2018, the amount Crypto Capital held and owed to iFinex exceeded $1 billion. I believe there were largely two reasons for this large balance: (1) an increasing interest in virtual currency trading and investment, leading to increasing amounts being transferred by Bitfinex customers; and (2)

institutional constraints on the amount of funds that could be transferred between Crypto Capital accounts and iFinex's bank accounts.

13. Our relationship with Crypto Capital generally operated well. In or about March or April 2018, however, we learned from news reports that Crypto Capital funds had been seized by authorities in Poland as part of an investigation into potential money-laundering. At the time, Yosef acknowledged to me that Crypto Capital's Polish bank accounts had been frozen, but claimed that none of iFinex's funds were affected by these actions.

14. In or about late August 2018, however, Yosef began representing to me that approximately $500 million of Bitfinex funds in both Poland and Portugal were being "held up" by regulators in both countries. From then through November 2018, Yosef repeatedly reassured me that the Bitfinex funds held in Poland and Portugal were on the verge of being released and that Crypto Capital was working diligently with local authorities to secure their release.

15. In response to increasing pressure from iFinex and its attorneys for specific information concerning the banking accounts that had been purportedly frozen, Yosef began providing additional information in the latter part of 2018.

**Current, Ongoing Foreign Proceedings Involving iFinex**

16. According to Crypto Capital, approximately $355,000,000 of iFinex's funds are being held in various currencies that were on deposit in accounts at Bank Spoldzielczy in Skierniewice, Poland. According to Crypto Capital, approximately $218,000,000 of Plaintiffs' funds are being held in various currencies in accounts at three separate Portuguese banks: Banco Português de Investimento ("**Banco BPI**"), Bankinter, S.A. ("**Banco BIC**"), and Caixa Geral de Depositos SA.

17. Since these and other subsequent disclosures, as well our own further investigation, we have been able to confirm that the National Prosecutor's Office in Poland has seized certain funds held by Crypto Capital in Bank Spoldzielczy. iFinex has filed a claim with the Prosecutor's Office as an "Injured Party" seeking to recover funds that Crypto Capital held in Poland on their behalf. iFinex also filed a civil claim against a Polish entity affiliated with

Crypto Capital that was the authorized holder of the accounts at issue located in Poland. Additionally, iFinex filed two criminal notifications against the representatives of the Polish entity affiliated with Crypto Capital concerning fraud and appropriation.

18. With respect to the funds held in the Portuguese banks identified above, we have filed an application for a protective order with the Court of Cascais in the Judicial Court of Western Lisbon against Global Trade and two other related companies (Eligibility Criterion and MOGW) to prevent the dissipation of funds held with Caixa Geral de Depósitos, Banco BPI and Banco BIC. We have also filed a separate application for protective order against the principals of those companies. iFinex intends to initiate a legal suit for recovery of those funds with the same court.

19. We have also learned that Crypto Capital maintained accounts with HSBC Bank PLC ("**HSBC UK**") in the United Kingdom. iFinex anticipates bringing a subsequent suit in the United Kingdom in order to recover the funds.

20. Based on my communications with Yosef, and to the best of our understanding of the limited banking records he has provided, Crypto Capital did not simply receive customer deposits into its various banking accounts and maintain those deposits with the initial bank receiving those funds. Rather, Crypto Capital subsequently transferred funds between and among various banks, including in Europe and the United States. In the U.S. alone, we have information that Crypto Capital used accounts held not only at Citibank, but also Bank of America, Bank of Colorado, Enterprise Bank & Trust, HSBC, Stearns Bank, Sun Trust, TD Bank, US Bank, and Wells Fargo.

21. Thus, in order to demonstrate iFinex's ownership of, and entitlement to, the various funds held in Poland, Portugal, and the United Kingdom, iFinex must be able to trace the funds deposited by its customers through the fund transfers between and among the various banking accounts operated or used by Crypto Capital. iFinex also seeks information regarding the ownership and use of the accounts at issue, as well as communications between the banks and account holders and/or their representatives.

**Crypto Capital's Use of Citibank Banking Accounts**

22. From approximately April to June 2018, Crypto Capital used a bank account ending in -9503 with Citibank to accept deposits from Bitfinex customers. The account was held in the name of Global Trading Solutions, LLC. Because the name of this LLC was similar to that of the entity that then owned Crypto Capital (Global Trade Solutions AG), we believed the LLC to be an entity related to Crypto Capital.

23. Since December 2018, we have subsequently learned through iFinex's investigation and review of its corporate filings that Global Trading Solutions, LLC is wholly owned by an individual named Reginald Dennis Fowler. Prior to December 2018, neither Yosef nor Crypto Capital had ever revealed Mr. Fowler's involvement in its operations. Yosef only admitted as much to me in or about late December 2018 and thereafter.

24. On December 12, 2019, the Central District of California granted a similar application to conduct discovery in *In re Application of iFinex Inc*., U.S.D.C. C.D. Cal. Case Number 19-mc-00022, granting leave for iFinex to conduct discovery of Citibank pursuant to 28 U.S.C. § 1782.

25. Following service of iFinex's subpoena authorized by the court, iFinex obtained Citibank bank records for numerous accounts held in the name of Global Trading Solutions LLC or Fowler. The records indicate Fowler used the -9503 account to receive approximately $195 million of Bitfinex customer funds in May and June 2018. The records also show Fowler transferring funds to other Citibank accounts held in his or Global Trading Solutions LLC's name, as well as transferring tens of millions of dollars to accounts held with other banks such as Bank of Colorado, Truist Bank (fka SunTrust Bank), Enterprise Bank and Trust, and Arizona Bank and Trust.

26. According to the wire transfer information for many of these transfers, several of these accounts are also held in the name of Spiral Global Development, Eligibility Criterion, or Eligibility Criterion Unip LDA.

27. As is particularly relevant here, the Citibank records show that Mr. Fowler transferred more than $130 million of iFinex funds to various Enterprise Bank & Trust accounts. As examples:

   a. On June 12, 2018, Fowler transferred $113,108,598.21 to Enterprise Bank & Trust Account No. 1227177. According to the wire transfer information, this account is held by Global Trading Solutions, LLC.

   b. On May 20, 2018, Fowler transferred $600,000 to Enterprise Bank & Trust Account No. 1127548. This account is held by Eligibility Criterion and the wire transfer was indicated as an "INTERCOMPANY TRANSFER."

   c. On June 3, 2018, Fowler transferred $5,000,000 to Enterprise Bank & Trust Account No. 1127599. According to the wire transfer information, this account is held by Spiral Global Development Corporation.

   d. On June 11, 2018, Fowler transferred $500,000 to Enterprise Bank & Trust Account No. 1128700. According to the wire transfer information, this appears to be a personal account held by Mr. Fowler.

28. Moreover, according to a Sealed Superseding Indictment filed by the United States Attorney for the Southern District of New York, Fowler appears to hold or control the following Enterprise Bank & Trust Accounts (see *U.S. v. Oz Yosef*, S.D.N.Y. Case No. 19-cr-00254-ALC; ECF No. 39):

   a. Account No. 1241367, in the name of Eligibility Criterion;

   b. Account No. 1127652, held in the name of Eurocontrol;

   c. Account No. 1127193, held in the name of Global Trading Solutions LLC;

   d. Account No. 1128727, held in the name of Reginald D. Fowler; and

   e. Account No. 1235784, held in the name of Spiral Sports II.

### Crypto Capital Related Entities, Affiliates, and Individuals

29. Applicant seeks the production of documents concerning the accounts used by the following entities and individuals to transfer and hold funds belonging to Applicant, any

transfers of funds to or from those accounts, the manner in which Applicant's funds were used, the current location of Applicant's funds, as well as communications with Crypto Capital or its various affiliated entities and individuals:

30. **Crypto Capital Corp**: A now-dissolved Panamanian entity that, according to historical snapshots of the www.cryptocapital.co website found on the Internet Archive, owned and operated both the website and the Crypto Capital business from approximately 2013 through August 2018.

31. **Global Trade Solutions AG**, a Swiss entity that, according to the Internet Archive, subsequently owned and operated the www.cryptocapital.co website and the Crypto Capital business at least as early as August 2018.

32. **Ivan Manuel Molina Lee**: I communicated with Mr. Lee on multiple occasions in which it was clear that he, along with Yosef, was a principal of Crypto Capital. According to certain corporate records obtained for Global Trade Solutions AG. He is also a registered director of that entity.

33. **Ozzie Yosef a/k/a Ozzie Joseph**: As noted above, Mr. Yosef held himself out to be one of Crypto Capital's principals and was my main contact with the company.

34. **Ravid Yosef**, Mr. Yosef's sister. According to an April 2019 indictment brought by the U.S. Attorney for the Southern District of New York, Ms. Yosef opened and used numerous accounts at FDIC insured banks in order to provide banking services to cryptocurrency exchanges like Bitfinex. In doing so, the indictment alleges that Ms. Yosef falsely represented that the accounts would be used for real estate investment transactions. Although neither Bitfinex nor Crypto Capital are specifically identified in the indictment, the allegations against Ms. Yosef lead me to believe that she was a participant in Crypto Capital along with her brother.

35. **Reginald Dennis Fowler**: As noted above, an individual who provided Crypto Capital access to various banking accounts in Europe and the United States through various entities which he owned or controlled. Prior to December 2018, Crypto Capital had never

revealed Mr. Fowler's involvement in its operations and only admitted as much to me in or about late December 2018 and thereafter.

36. **Trent Dennis Fowler**, a son of Reginald Dennis Fowler. According to certain banking records provided by Crypto Capital to me, Trent Fowler is the registered account holder for at least one of the accounts used by Crypto Capital to receive deposits from Bitfinex customers.

37. **Global Trading Solutions, LLC**: An entity Crypto Capital used to receive and disburse Bitfinex customer deposits. When Crypto Capital provided the banking information to receive Bitfinex customer funds, we believed Global Trading Solutions, LLC to be owned or controlled by Crypto Capital, given the similarity between its name and that of the Global Trade Solutions AG entity operating Crypto Capital. Through our subsequent investigation, and after obtaining certain corporate records filed by Global Trading Solutions, LLC, we learned that the entity was, in fact, actually wholly owned by Mr. Fowler.

38. **G.T.S. Resources Limited**: A United Kingdom entity that, according to Yosef, is currently holding more than $304,000,000 of iFinex's funds with TCA Investment Bancorp & Trust. According to its corporate filings, G.T.S. Resources Limited is also wholly owned by Mr. Fowler. In December 2018—after we learned of Mr. Fowler's involvement with Crypto Capital—Fowler changed the corporate name of the entity to Spiral Global Development Limited.

39. **TCA Investment Bancorp & Trust Company**: an entity claiming to hold more than $304,000,000 in funds on behalf of G.T.S. Resources Limited. Despite its name, however, TCA Investment Bancorp & Trust is not a bank and appears to have no physical presence. According to its website, TCA Bancorp is operated by at least four principals: **Katsuyoshi Iwanaga**, **Diane Fletcher**, **David Anthony Stafford**, and **Rondell Monroe**.

40. **Eligibility Criterion** and/or **Eligibility Criterion Unipessoal LDA**: An entity owned or controlled by Fowler. According to Citibank records obtained through a similar application as the present one—after receiving iFinex customer funds to the Citibank account

noted above, Fowler caused several millions of dollars of customer funds to be wire transferred to various banking accounts held in the name of "Eligibility," "Eligibility Criterion," and "Eligibility Criterion Unip LDA." Each such transfer included a description as "Intercompany Transfer".

41. **Spiral Global Development**: an entity owned or controlled by Fowler, according to corporate records obtained by iFinex during the course of its investigation. As noted above, after receiving Bitfinex customer funds to the Citibank account, Fowler transferred millions of dollars of those funds to at least one Enterprise Bank and Trust account held in the name of Spiral Global Development.

42. **NLE Consulting Group**: a Florida entity created in February 2018 and for which Mr. Fowler is registered as a Vice President, according to its corporate filings. In March 2018, the entity also applied for a fictitious name of "Global Trading Solutions," a name substantially similar to Global Trade Solutions AG, the entity that owns and controls the cryptocaptial.co website.

43. Attached hereto as Exhibit "A" is a copy of the requests for production that iFinex currently intends to seek from Enterprise Bank & Trust. These requests are attached to the subpoena attached as Exhibit 1 of the Application.

44. Enterprise Bank & Trust's corporate headquarters is located at 150 North Meramec, Clayton, Missouri.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 25 day of June 2020, at MILAN ITALY

_____
Giancarlo Devasini